**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| YUEQIU HUANG, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. AW-08-2882 |
| | * | |
| CARLOS GUTIERREZ, | * | |
| | * | |
| Defendant. | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM OPINION

Plaintiff Yueqiu Huang ("Huang") filed this case against Defendant Carlos Gutierrez ("Gutierrez"), Secretary of the Department of Commerce, on October 30, 2008, alleging her termination of employment from the Census Bureau was based on her national origin and sex, and was in retaliation for protected Equal Employment Opportunity ("EEO") activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* On March 30, 2009, Defendant Gutierrez filed the instant Motion for Summary Judgment. (Docket No. 11.) The Court has reviewed the entire record with respect to the instant Motion.  The issues have been briefed, and this Court held a hearing on the motion on December 18, 2009.  *See* Local Rule 105.6 (D. Md. 2008.)  For the reasons stated below, the Court will GRANT in part and DENY in part Defendant's Motion for Summary Judgment. (Docket No. 11.)

## I.      FACTUAL BACKGROUND

On May 24, 2004, Mr. Robert Colosi contacted Dr. Yueqiu Huang, a Chinese-American with a Ph.D. in Statistics, and advised her to apply for a position as a Survey Statistician with the Planning, Research, and Evaluation Division ("PRED") of the U.S. Bureau of the Census

1

("Census Bureau"). Dr. Huang applied for the position of Survey Statistician, GS-13, and was selected. Her employment, beginning September 7, 2004, was subject to a one-year probationary period. In this position, Dr. Huang was responsible for designing, developing, implementing, and evaluating statistical programs. Robert Colosi ("Colosi"), Branch Chief, was Plaintiff's first-line supervisor, James Treat ('Treat"), Assistant Division Chief, was her second-line supervisor, and Ruth Ann Killion ("Ms. Killion"), Division Chief, was her third-line supervisor.

Dr. Huang's first assignment was to evaluate the United States Postal Service's Delivery Sequence File ("DSF") for the Geography Division of the Census Bureau, with respect to its accuracy and usability. To complete the project successfully, by February 3, 2005, Dr. Huang needed to produce a study plan outlining the research she would perform, and by September 30, 2005, needed to produce a report documenting the research she would conduct. But, Mr. Colosi only revealed the September 2005 final deadline to her. Dr. Huang also alleges Mr. Colosi actually hindered her work by insisting *he* set up the plan review meeting with the client that Dr. Huang suggested in late 2004. When Dr. Huang followed up with him regarding the scheduling, he asked her why she was in such a hurry and then scheduled the meeting for a month afterwards. (Doc. No. 20 at 18.)

Regardless, in early November 2004, Mr. Colosi was not satisfied with Dr. Huang's progress and informed Ms. Killion that Dr. Huang was having trouble meeting deadlines and following directions. Then, in late November 2004, Mr. Colosi addressed his continuing concerns with Dr. Huang, telling her that she was not performing acceptably, and needed to complete tasks in a timely manner. In January and early February, 2005, Mr. Colosi requested

2

that Dr. Huang produce a definition of "waffling" for one of the two parts of her evaluation, and when she failed to do so, he did it himself in twenty minutes.

In January 2005 the Agency began a formal administrative investigation of Mr. Colosi after a female GS-13 Statistician who reported to Mr. Colosi complained that Mr. Colosi was treating female staff inappropriately. The investigation included interviews with the six employees Dr. Colosi directly supervised, including Dr. Huang. On or about March 9, 2005, Dr. Huang informed Mr. Robert Creecy, the Human Resources investigator assigned to Mr. Colosi's case, that Mr. Colosi discriminated against women. On the same day, she reported the same concerns that Mr. Colosi made condescending and degrading comments to his female staff and disrespected them, to Mr. Treat.

Mr. Treat took over as Huang's first-line supervisor after the Agency temporarily suspended Mr. Colosi from his position on February 14 or 15, 2005, during the pendency of the results of the investigation against Mr. Colosi. In his new role as her first-line supervisor, Mr. Treat met with Dr. Huang much more frequently to discuss her DSF project. After March 9, 2009, the date on which Dr. Huang assisted in the investigation against Mr. Colosi, Mr. Treat met with Dr. Huang as often as once per week, whereas Mr. Treat had only met with her to discuss her project one time prior to this date. On March 9 and 10, 2005, Mr. Treat asked Dr. Huang to provide two copies of her study plan, and did side-by-side comparisons, demanding that she incorporate all edits.

Throughout the spring, Mr. Treat continued to express dissatisfaction with Dr. Huang's technical performance and response to direction. On March 23 or 24, 2005, Mr. Treat conducted a progress review with Dr. Huang and noted that Dr. Huang had failed to incorporate Mr.

Colosi's comments into her most recent draft of her study plan, that she was not adequately

merging the analysis files, and that her participation in project status meetings was inadequate.

At one point he advised her to update her schedule to enable her to complete the tasks by

September 30, 2005, which she failed to do. She also refused to run an analysis Mr. Treat and

Mr. Colosi instructed her to perform, and according to Mr. Treat, could not interpret the analysis

she did run.

Dr. Huang feels none of these criticisms are true. She alleges that though she may have

missed a few items in her project status meeting notes, she generally took notes on everything

she was supposed to do, and that Mr. Sweeney thought she performed well. (Doc. No. 20 at 15-

16.) She also contends that Mr. Treat acknowledged that as of February 11, 2005, the Geography

Division was pleased with Dr. Huang's work, and Mr. Colosi told her the plan needed only

cosmetic changes. (Doc. No. 20 at 9.) Dr. Huang also contends that the only reason she was slow

in merging files was that she had noticed problems in duplicate records that needed to be

addressed. Dr. Huang explains that Mr. Treat yelled at her whenever she "didn't get [analyses]

done immediately," even though he did not yell at other people for that. (Doc. No. 20 at 20.) Dr.

Huang alleges Mr. Treat insisted that she incorporate his editorial comments into his work,

whereas the general rule was that employees did not have to incorporate editorial comments.

(Doc. No. 20 at 14.) Dr. Huang believed this increased criticism from Mr. Treat was sparked by

the statements she had made against Mr. Colosi during the investigation against him.

In March 2005, Mr. Treat met with personnel from human resources to discuss how to

substantiate Dr. Huang's termination. In April or May 2005, Mr. Treat advised Ms. Killion that

Dr. Huang continued to fail to meet deadlines. On April 1, 2005, Dr. Huang notified a Human

Resources Specialist that she felt management resented her for her participation in the investigation and that Mr. Treat had treated her badly ever since her participation in the investigation.

The Agency reprimanded Mr. Colosi for inappropriate behavior in the workplace on May 24, 2005, determining that he trivialized women's work and was overly critical of them, but concluding that he had not engaged in sexual harassment or discrimination.

On July 15, 2005, Ms. Killion, the Reviewing Official, rated Dr. Huang "unsatisfactory" in three of seven "Critical Elements" of her performance: (1) Evaluation Planning and Project Management, (2) Data Analysis, and (3) Research and Development.  Dr. Huang refused to sign this evaluation as she felt it was inconsistent with the reality of her work. Mr. Treat recommended that Dr. Huang be terminated, and Ms. Killion did not object, after reviewing the situation. In a letter dated July 19, 2005, the Agency informed Dr. Huang that her employment would be terminated on July 22, 2005, because she failed to effectively complete evaluation, planning and management of her project and failed to demonstrate an ability to analyze data or perform research. Dr. Huang resigned on July 21, 2005 to avoid being terminated.

On July 18, 2005, Dr. Huang contacted the Equal Employment Opportunity Office (EEOO), and on September 12, 2005, she filed a claim with the EEOO alleging discrimination based on gender, national origin, and retaliation. The EEOO investigated the case and issued a Report. Additionally, around January 7, 2008, Dr. Huang filed a complaint alleging reprisal for whistleblowing with the Office of Special Counsel (OSC) pursuant to 5 U.S.C. § 2302(b)(8), which the OSC declined to pursue on March 28, 2008. On January 28, 2008, the Agency issued a final decision pursuant to 29 C.F.R. § 1614.110(b), concluding that Dr. Huang failed to prove the

Department of Commerce had discriminated or retaliated against her. Dr. Huang then appealed

the decision to the Equal Employment Opportunity Commission Office of Federal Operations

(OFO) which found Dr. Huang failed to show the Agency discriminated against her. On August

1, 2008, the OFO denied Dr. Huang's request to reconsider her appeal.

On October 30, 2008, Dr. Huang brought the instant complaint in this Court against the

Secretary of the Department of Commerce alleging discriminatory employment practice and

termination of employment on the basis of national origin and sex in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* (Counts 1 & 2); as well as retaliatory

employment practice and termination of employment in violation of Title VII of the Civil Rights

Act of 1964 (Count 3). She seeks declaratory and injunctive relief, including reinstatement to the

position she previously held, backpay, and compensation for her lost benefits. On March 30,

2009, Defendant moved for summary judgment, arguing there is no genuine dispute of material

fact in this case because the Agency's decision to terminate Dr. Huang was not based on her

national origin or sex, and was not in retaliation for her participation in the investigation of Mr.

Colosi.

## II.    **<u>STANDARD OF REVIEW</u>**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight

to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496,

520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a

motion for summary judgment, the nonmoving party must come forward with affidavits or other

similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving

party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot

create a genuine dispute of material fact through mere speculation or compilation of inferences.

*See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).  Additionally, hearsay

statements or conclusory statements with no evidentiary basis cannot support or defeat a motion

for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of*

*Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.   ANALYSIS

### A.  Title VII Discrimination based on Sex and National Origin

There are two methods for proving intentional discrimination in employment: (1) through

direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence

under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Where the plaintiff lacks "evidence of conduct or

statements that both reflect directly the alleged discriminatory attitude and that bear directly on the

contested employment decision," the plaintiff nevertheless may proceed under *McDonnell Douglas*.

*Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001) (internal quotation omitted), *cert. denied*, 535

U.S. 933 (2002). Under the *McDonnell Douglas* framework for showing discrimination through

circumstantial evidence, the plaintiff first must establish a prima facie case of discrimination.  *See*

*McDonnell Douglas Corp.*, 411 U.S. at 802.  To establish a prima facie case of discrimination, the

Plaintiff must show that: 1) plaintiff is a member of a protected class; 2) plaintiff was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; 3) plaintiff suffered an adverse employment action; and 4) other similarly situated employees outside the protected class were treated more favorably. *See Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). "The prima facie case serves as a screen for cases whose facts give rise to an inference of non-discrimination -- screening those cases out -- rather than as a test the satisfaction of which affirmatively establishes an actual inference of discrimination." *Miles v. Dell, Inc.*, 429 F.3d 480, 488 n.5 (4th Cir. 2005).

Once a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's prima facie case. *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10).  The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.  In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her."  *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

## 1. **Prima Facie Case**

Plaintiff alleges Defendant discriminated against her based on her sex and national origin, and provides circumstantial evidence of this discrimination under the *McDonnell Douglas*

framework.  Plaintiff and Defendant agree that Huang is a member of protected classes as a female and Chinese-American, and that her termination constitutes an adverse employment action. Defendant, however, argues that Plaintiff cannot make out a prima facie case because Plaintiff cannot show she was performing her job at an acceptable level, and she cannot show the employer treated similarly situated employees outside of the protected class differently. The Court finds that the Plaintiff has failed to make a prima facie case of discrimination based on either sex or national origin. Though Dr. Huang has submitted sufficient evidence that she was meeting the legitimate expectations of her employer, she fails to show the fourth element of the prima facie case--that other similarly situated people outside of the protected class were treated more favorably than her.

### i.    Meeting Legitimate Employment Expectations

To prove a prima facie case of employment discrimination, a plaintiff has the burden of showing, by a preponderance of evidence, that he or she met the employer's legitimate job expectations. "The employee is therefore required to show that 'he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.' Courts should not interpret this element too strictly, in order to avoid premature dismissal of potentially meritorious claims." *Miles v. Dell, Inc.*, 429 F.3d 480, 488 n.5 (4th Cir. 2005) (citation omitted).

In determining whether Plaintiff met her legitimate job expectations, the Court may consider only statements elaborating what the employer's expectations were, and analyses of whether a plaintiff met them.  Evaluations speaking to an employee's qualifications have no bearing on the analysis of whether an employee met her employer's legitimate expectations

9

because "[a]n employee may be qualified when hired, but could fail either to maintain his qualifications or, more commonly, to meet his employer's legitimate expectations for job performance.'" *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006).

Generally, only the employer's perception of whether the employee met expectations is relevant. "The Plaintiff's own perception of her job performance cannot create an issue of fact on this element." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-961 (4th Cir. 1996). Moreover, "coworkers' fact testimony cannot build a prima facie case for [Plaintiff]." *King v. Rumsfeld*, 328 F.3d 145, 150 (4th Cir. 2003) (finding that co-teachers' testimony that the lesson plans of plaintiff (a terminated teacher) looked like theirs was insufficient to establish that teacher was meeting employer's expectations, as it did not address what the employer's expectations were nor analyze whether he met them); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) ("The alleged opinions of Hawkins' co-workers as to the quality of her work are similarly 'close to irrelevant.'"). Likewise, the opinions of prior employers and other third parties are irrelevant to showing whether she met this employer's expectations. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 445 (4th Cir. 1998) ("Furthermore, although the affidavits put forth by Tinsley document the fact that certain co-workers, Bank customers and attorneys believed Tinsley was doing a good job, they fail to address whether management honestly believed that Tinsley was doing a good job.").

In response to an employee's showing that he or she met the employer's job expectations, "the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516 (4th Cir. 2006); *see Jyachosky v. Winter*, No. 08-1077, 2009 U.S. App. LEXIS 20356, *12-13

10

(4th Cir. Sept. 14, 2009) ("Although Jyachosky can point to positive performance reviews, there is ample evidence in the record that she was having substantial problems with her supervisory role."). The employee may then counter the employer's interpretation of the job expectations with other evidence of what the expectations were. *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 517 (4th Cir. 2006) ("Although on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all.").

Whether Huang can "point to evidence from which a rational factfinder could conclude at the time of termination that she was meeting her employer's legitimate job expectations," is a close question in this case. *Tarver v. Winter*, 535 F. Supp. 2d 565, 570 (E.D.N.C. 2008). Because Dr. Huang points to evidence that her employers told her they were satisfied with her work, and Defendant does not allege Dr. Huang committed any egregious violation of her employer's expectations that clearly prevent her from making a prima facie case, the Court finds that Dr. Huang has met her burden of showing that she met her employer's expectations for the purposes of this element of the prima facie case. *C.f. id.* (granting summary judgment to defendant where plaintiff failed to establish she was meeting the employer's legitimate job expectations because she was present for only 669.5 of the 1865 hours she was assigned to work).

In determining whether Dr. Huang met the employer's expectations, the Court cannot consider much of the evidence Dr. Huang offers, which is her own characterizations of her work, her colleague's impressions, her customer's impressions as to the general quality of her work, and her peers and her colleagues' surprise that someone with her qualifications would be fired.

11

For example, Plaintiff notes that nine individuals have concluded that Dr. Huang could not have been terminated for poor performance and that her peers considered her "the most technically skilled Statistician in the Survey Branch and was known for being a very hard, diligent worker." (Doc. No. 20, Disputed Material Fact No. 17(g).) But, these statements cannot factor into the Court's determination of whether Dr. Huang met her employer's expectations because evidence that her peers thought she performed well, and that her client was satisfied with her performance, does not show she met her employer's job expectations. *See, e.g.*, *Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988).

In this case, the only people who were in a position to directly evaluate Plaintiff's work were also the two people who are accused of discrimination--Mr. Colosi and Mr. Treat. As Defendant notes, Mr. Colosi and Mr. Treat were the only two supervisors who directly oversaw Dr. Huang's work, and thus are the only two employers who can directly assess whether Dr. Huang was meeting the employer's expectations. Defendant presents evidence that Mr. Colosi and Mr. Treat expressed dissatisfaction with Dr. Huang's performance beginning in November 2004, just two months after Dr. Huang was hired. Mr. Colosi gave her two warnings regarding her performance in late November, advising her that she was not working independently enough and was not completing tasks on time. When Dr. Huang failed to create a definition in one of the two parts of the DSF evaluation, despite Mr. Colosi's multiple requests that she do so, Mr. Colosi simply performed the task himself. This evidence falls short of the formalized notifications of poor performance to employees that Courts typically find shows an employee was not meeting expectations. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006) ( holding plaintiff failed to make prima facie cases where "OCIC reprimanded Warch

based on concrete, specific observations and accompanied its  reprimands with explicit instructions on how to improve.").

   While Defendant presents some evidence that Mr. Colosi was not satisfied with Dr. Huang's work, Plaintiff points to other admissible evidence that her employer was satisfied with her work. Plaintiff shows that when Colosi returned her study plan in February 2009, he told her it was good and only needed cosmetic changes. (Doc. No. 20, Ex. 6 at 32.) Also, Mr. Treat acknowledges that Huang's document was on time after they had re-planned the schedule. (Doc. No. 20, Ex. 17 at 41.) Additionally, Dr. Huang alleges that in a June 2005 meeting, Treat told her she did a good job. Though more concrete evidence of employer's satisfaction with an employee's performance is desirable to show an employee met the employer's legitimate expectations, in this case, these items will suffice for the purpose of assessing whether a plaintiff can survive a summary judgment motion on this issue. *C.f. Loveless v. John's Ford, Inc.*, 232 Fed. Appx. 229, 235 (4th Cir. Va. 2007) (evidence established employee met legitimate expectations of employer where he "had received numerous awards during the time he served as its Director" by winning "Blue Oval" certification,  winning the "Satisfaction Pays" contest, qualifying for Ford's "President's Award," achieving "Master Certification as Service Manager, Warranty Administrator, and Sales Manager," and was named one of the "'Best of Leesburg' by the local newspaper that year.").

   Plaintiff also asserts that the expectations Defendant claims she failed to meet were not in fact expectations of all employees, but rather, were unique to her. Plaintiff claims that the employer did not require other employees to incorporate all edits, that the employers were not overly concerned with timelines, and that they did not actually think she had fallen behind. Mr.

Treat acknowledged the deadlines were generally flexible and could be extended, and that missing one "itself would not be reason for termination." (Doc. No. 20, Fact 2(e).) Dr. Huang's peers observed Mr. Colosi "treated her worse than other employees from day one," and Mr. Treat "began to hold Dr. Huang to different standards than her peers, to baselessly accuse her of unacceptable work product, and to blame her for issues that were not her fault or within her control." (Doc No. 20, Facts 9(c) and 10(a).) "By his own admission, he was 'nitpicking' Dr. Huang's work and proposed Dr. Huang's termination for acts that were common-practice among Agency employees." (Doc No. 20, Fact 7(g).) The Court finds that these questions as to the legitimacy of the expectations of Mr. Treat and Mr. Colosi, as well as the evidence Plaintiff has submitted showing the employers were satisfied with her performance, are sufficient to allow the Plaintiff to make out this element of the prima facie case. Dr. Huang has made a showing that she met her employer's legitimate expectations sufficient for establishing a prima facie case.

   **ii.**   **Treatment of similarly situated employees outside the protected class**

   Next, to make out a prima facie case of discriminatory discharge, a Plaintiff must show (4) "she was replaced by a member outside the protected class, or similarly situated employees outside the protected class were treated more favorably." *Lawrence v. Veolia Transp. Servs.*, No. 07-2722, 2009 U.S. Dist. LEXIS 28589 *14 (D.S.C. Mar. 30, 2009); *see also Jyachosky v. Winter*, 2009 No. 08-1077, U.S. App. LEXIS 20356, *12-13 (4th Cir. Sept. 14, 2009) ("Jyachosky is unable to establish the final element of a prima facie case of gender discrimination because she was replaced by a member of her protected class."); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 519 (4th Cir. 2006) (strict analysis penalizing Plaintiff for not making this showing: "in light of his own admissions, he cannot prevail on his argument that he

was replaced at all, much less by a substantially younger employee."). "[A] plaintiff must ordinarily show that she was replaced by someone outside her protected class because, when someone within her protected class is hired as a replacement, that fact ordinarily gives rise to an inference that the defendant did not fire the plaintiff because of her protected status." *Miles v. Dell, Inc.*, 429 F.3d 480, 488-489 (4th Cir. 2005) (except in special cases where "replacement hiring decisions are made by different decisionmakers" or "defendant hires someone from within the plaintiff's protected class in order 'to disguise its act of discrimination toward the plaintiff.'"); *c.f. Warren v. Fort Lincoln Cemetery, Inc.*, 2001 U.S. Dist. LEXIS 9013 (D. Md. June 26, 2001) (where an employee was replaced by someone inside the protected class "his claim of discrimination rests upon establishing that similarly situated employees outside his protected class were treated more favorably").

Plaintiff's prima facie case fails because Plaintiff does not show that she was replaced by someone outside the protected class, nor does she point to any similarly situated employees outside of the protected class who were treated more favorably. Defendant cites *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) for the proposition that only other probationary employees can be deemed similarly situated to other probationary employees. Plaintiff contends first that it is not necessary she plead other similarly situated employees were treated better than her, as she has already plead facts giving rise to an inference of discrimination. Moreover, she alleges that Mr. Colosi treated men more respectfully than women and that other employees have observed Mr. Colosi treated her worse than other employees.

Plaintiff has not shown any individuals who were similarly situated who were treated more favorably. Though the Court will not always reject a Plaintiff's claim where there simply

are no other similarly situated employees, Plaintiff must make some showing in this regard to allow the Court to make the inference that her firing was discriminatory. Plaintiff's argument that she does not have to show similarly situated employees were treated more favorably because she has already shown facts allowing the Court to make an inference of discrimination is unconvincing. While the purpose of making out a prima facie case is to show an inference of discrimination, courts do not typically excuse plaintiffs from making a showing on an element of the prima facie case absent some compelling reason.  Plaintiff does show that the employer did not require all employees to meet the deadlines she had to meet, but her very general allegations that Mr. Colosi treated other employees better are not sufficient to make out a prima facie case. As the burden is on the Plaintiff on this matter, the Court finds Plaintiff's failure to fully address this issue disables her from making a prima facie case of employment discrimination based on sex or national origin.

Despite the Court's finding that the Plaintiff has not made a prima facie case of employment discrimination based on sex or national origin, the Court will briefly address the other steps in the *McDonnell Douglas* framework for proving discrimination in this case.

### 2.   **Employer's Proffered Reasons**

If the Court were to decide Plaintiff made a prima facie case of discrimination or retaliation, the employer could rebut the prima facie case by showing there was a legitimate, nondiscriminatory reason for its adverse employment action. *See Tarver v. Winter*, 535 F. Supp. 2d 565, 570 (E.D.N.C. 2008) ("Even assuming that Tarver established a prima facie case, the Navy has offered a legitimate nondiscriminatory reason for terminating her employment."). "The employer's burden at this stage 'is one of production, not persuasion; it can involve no

16

credibility assessment.'" *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006)

(citation omitted).

Defendant argues that Dr. Huang's unacceptable performance constitutes a legitimate,

nondiscriminatory reason for her termination of employment. Plaintiff does not dispute that

Defendant has met its burden of production on this point.

### 3.   Burden of Demonstrating Pretext

Because the Defendant offered a "legitimate nondiscriminatory reason for its decision,

plaintiff must come forward with sufficient evidence from which a rational factfinder could

conclude that the proffered reason was a pretext (i.e., a sham) designed to mask . . . [sex or

national origin] discrimination." *Tarver v. Winter*, 535 F. Supp. 2d 565, 570 (E.D.N.C. 2008).

"This burden now merges with the ultimate burden of persuading the court that she has been the

victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256

(1981). A plaintiff can "prove pretext by showing that the alleged non-discriminatory

'explanation is unworthy of credence or by offering other forms of circumstantial evidence

sufficiently probative of [sex] discrimination.'" *Id.* (citation omitted).

The Court may consider similar facts to those it considered in adjudicating the prima

facie case. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (holding a

plaintiff failed to show pretext "for the same reasons that he could not make that showing with

respect to his discriminatory discharge claim"). As with the prima facie case, a plaintiff's

subjective belief that an employer "treated her differently and ultimately terminated her

employment due to her sex is not sufficient to create a genuine issue of material fact." *Haley v.

Wal-Mart Stores East, L.P.*, No. 07-219, 2008 U.S. Dist. LEXIS 95322, *5-6 (E.D.N.C. Nov. 17,

17

2008). Instead, "when assessing pretext, the Court's focus must be on the decisionmaker's perception, namely whether the decisionmaker's belief in its stated reason was credible. . . . if an employer has a good faith belief in its proffered reason, a plaintiff has not established discrimination simply by showing that the employer was factually incorrect." *Bonds v. Leavitt*, No. 07-2426, 2009 U.S. Dist. LEXIS 72287 *42 (D. Md. Aug. 13, 2009); *see also Price v. Thompson*, 380 F.3d 209, 217 (4th Cir. 2004) (affirming summary judgment where finding employee could not show pretext on two of the employer's rationales for termination, even where employee showed employer had relied on two inaccuracies in the firing as to the other rationales).

A court may also consider stray comments that provide circumstantial evidence of discriminatory animus, in combination with other evidence. *See Warren v. Fort Lincoln Cemetery, Inc*., No. 00-419, 2001 U.S. Dist. LEXIS 9013 (D. Md. June 26, 2001) (holding though employer's racial slurs were not direct evidence of discriminatory intent, the employer's "conduct may still support Plaintiff's case as circumstantial evidence of discriminatory animus" by employer). The Court may weigh these stray comments in deciding whether a discriminatory animus is the most likely explanation for a plaintiff's termination. *See Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) ("[T]hough such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers.'"); *Martin v. Orthodontic Ctrs. of S.C., Inc.*, 93 F. Supp. 2d 682, 686 (D.S.C. 1999) ("The plaintiff must demonstrate that, as between race and the articulated reason, race was the more likely reason for

the dismissal."). Moreover, "[e]ven when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if 'no rational factfinder could conclude that the action was discriminatory.'" *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (citation omitted).

The Court finds that Plaintiff fails to show that the employer's rationale for termination--poor performance--is a pretext for sex or national origin discrimination. First, as with the prima facie case, the opinions of Plaintiff's co-workers cannot refute the Agency's well-documented examples of her poor performance because none of the co-workers were in a position to witness the problems that Mr. Colosi and Mr. Treat witnessed.

Plaintiff's allegation that the employer's criticism of her English shows a discriminatory animus against her national origin cannot stand in this case. Courts do not automatically find that terminations based on a stated rationale of lack of language fluency is a pretext for national origin discrimination. *Fragante v. Honolulu*, 888 F.2d 591, 597 (9th Cir. 1989) ("Employers may lawfully base an employment decision upon an individual's accent when -- but only when -- it interferes materially with job performance."). Rather, the Plaintiff must prove a nexus exists between the employer's adverse employment action and the plaintiff's accent. *See Bhella v. England*, 91 Fed. Appx. 835, 846 (4th Cir. 2004) (finding no discriminatory animus where staff made fun of plaintiff's accent behind her back and employer who hired her described her as speaking "broken English" because these comments were from a year prior). Here, lack of English fluency was not the stated rationale for Dr. Huang's termination, and though Mr. Colosi made these critiques sufficiently close to the time of firing Dr. Huang, and other people denied that she had poor English, these criticisms do not provide sufficient circumstantial evidence of

discriminatory animus because the comment was not sufficiently closely related to the employment decision in any other way, and there is no other evidence supporting this allegation.

Regarding the stray derogatory comments about women—because these comments were not directed at Dr. Huang and because the comments were vague, they are insufficient, in the balance, to show discriminatory animus. Mr. Colosi's stray remarks are too generalized and removed from the employment decision to support a finding of pretext in her sex discrimination claim, without other supporting evidence.

Thus, even if the Court were to decide Plaintiff has made a prima facie case of national origin and sex discrimination in the case, the Court should not send Plaintiff's discrimination claim to a jury, as Plaintiff has not shown, by a preponderance of the evidence, that the Defendant's rationale for termination was actually a pretext for sex or national origin discrimination.

### B.  Title VII Retaliation

"To establish a prima facie case of retaliation, an employee must show (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that a causal connection exists between the protected activity and the adverse employment action." *Lyle v. County of Fairfax Va.*, No. 05-1134, 2006 U.S. App. LEXIS 6025, at *20 (4th Cir. Mar. 10, 2006). After a Plaintiff makes a prima facie case, Defendant bears the burden of producing a legitimate nondiscriminatory reason for the adverse employment action. *See id.* Next, the Plaintiff bears the burden of showing, by a preponderance of the evidence, that the Defendant's stated rationale is a pretext for retaliation. *See id.*

### 1. Prima Facie Case

The parties agree that Plaintiff has met the first two requirements of the prima facie case of retaliation as Plaintiff engaged in a protected activity by participating in the investigation, and the Agency took an adverse employment action by firing her. The parties disagree on whether there is a causal connection between her participation in the investigation and her termination.

Where there is no direct evidence of an employer's retaliatory intent, the employee may rely on an inference of causation arising from the proximity of engagement in the protected activity and the adverse employment action suffered in retaliation. *See Bonds*, 2009 LEXIS 72287 at *77. The Fourth Circuit has deemed a three-month nexus to be sufficient to establish a causal connection. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). But, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. Va. 2006) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

The Court finds that Plaintiff has sufficiently made out a prima facie case of retaliation. Relying on a temporal nexus theory, Plaintiff argues that a pattern of antagonism ensued after her engagement in the protected activity, and that the Agency terminated her just four months after her reporting. Mr. Treat held only one meeting with Dr. Huang from February 14, 2005, to March 9, 2005, and never told her he had problems with the progress of her study plan during this period. After her reporting, however, he met with her nineteen times and criticized or "nitpicked" her work. Just five days after her report to Mr. Creecy and Mr. Treat, Mr. Treat discussed with human resources how to substantiate Dr. Huang's termination. Additionally, Mr.

Treat proposed the termination of Nancy Johnson after she complained about Mr. Colosi's poor treatment of women.

Defendant disputes that there was a causal connection between Dr. Huang's firing and her participation in the interview because Defendant's dissatisfaction with Dr. Huang's job performance began prior to her participation in the investigation, in early November 2004. Defendant also contends that Mr. Treat's behavior toward Plaintiff began changing around late February 2005, not after March 9, 2005, because in late February Mr. Treat settled into his new role as Dr. Huang's supervisor and began familiarizing himself with the six projects Mr. Colosi had supervised prior to his suspension from that position. Defendant points to Mr. Treat's several meetings with Dr. Huang to discuss her project before her March 9, 2005, participation in the investigation—a meeting on March 1, a project status meeting on March 7, a staff meeting on March 8, and a pre-performance review meeting at Dr. Huang's request on March 9. Even so, there was a clear increase in Mr. Treat's criticism of Dr. Huang's performance after the March 9, 2009 meeting. Thus, the Court believes Plaintiff has established a prima facie case of retaliation.

### 2.  Employer's Proffered Reasons

Next, Defendant argues that Dr. Huang's unacceptable performance constitutes a legitimate, nondiscriminatory reason for her termination of employment. Plaintiff does not dispute that Defendant has met its burden of production on this point.

### 3.  Burden of Demonstrating Pretext

The Court believes that Plaintiff has successfully presented sufficient evidence to show that the Defendant's proffered reason for her termination—unacceptable performance—is a pretext for retaliation. Mr. Treat individually did not voice concerns about Dr. Huang's

performance, even after he became her manager, until her participation in the investigation. Dr. Huang has presented sufficient evidence that Mr. Treat was satisfied with her work until she participated in the investigation against Mr. Colosi. Defendant contends Dr. Huang cannot show that the Agency's stated rationale for the termination is a pretext by arguing that her relationship with Mr. Treat changed after she participated in the administrative investigation of Mr. Colosi, as Mr. Treat took over for Mr. Colosi as Dr. Huang's first-line supervisor during this time, so it was obvious that he would treat her differently.  (Doc. No. 11 at 21.) But, there were three weeks in which Mr. Treat was her supervisor, but never criticized her work. The Court cannot determine, as a matter of law, whether Mr. Treat's increased criticism of Dr. Huang, which began after Dr. Huang's reporting against Mr. Colosi, was simply a product of Mr. Treat's new position, or retaliation against Dr. Huang for reporting, where the evidence regarding her prior performance and the evidence of whether she was meeting her employer's legitimate job expectations was mixed, and as the Court stated earlier, was a close call. Thus, the Court will deny Defendant's motion to grant summary judgment on the retaliation claim.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment. A separate Order will follow.

   January 5, 2010                                                             /s/                       
                                                                           Alexander Williams, Jr.
                                                                           United States District Judge

23