## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

YUEQIU HUANG,                                            *
                                                 *

     Plaintiff,                                   *
                                                 *

          v.                                   *       Civil Action No. AW-08-2882
                                                 *

CARLOS GUTIERREZ,                  *
                                                 *

     Defendant.                                 *

*****************************************************************************

## MEMORANDUM OPINION

Plaintiff Yueqiu Huang filed this case against Defendant Carlos Gutierrez, Secretary of the Department of Commerce, on October 30, 2008, alleging that the termination of her employment from the Census Bureau was based on her national origin and sex, and was in retaliation for protected Equal Employment Opportunity ("EEO") activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"). On March 30, 2009, Defendant Gutierrez filed a pre-discovery Motion for Summary Judgment. (Doc. No. 11). The Court granted summary judgment on Plaintiff's discrimination claims, but denied summary judgment on Plaintiff's retaliation claim. (Doc. No. 32). Defendant Gary Locke[1] has again filed for Summary Judgment with respect to the retaliation claim. (Doc. No. 49). The Court has reviewed the entire record with respect to the instant Motion and finds that no hearing is necessary. *See* D. MD. LOC. R. 105.6 (2010). For the reasons stated below, the Court will GRANT Defendant's Motion for Summary Judgment. (Doc. No. 49).

---

[1] Gary F. Locke is the new Secretary of the Department of Commerce. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Gary F. Locke is substituted for Carlos Gutierrez as the Defendant in this action.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. General Background

Huang was a Survey Statistician, GS-13, with the Planning, Research, and Evaluation Division ("PRED") of the U.S. Bureau of the Census ("Census Bureau"). Her employment began September 7, 2004, and was subject to a one-year probationary period. In this position, Huang was responsible for designing, developing, implementing, and evaluating statistical programs. Robert Colosi, Branch Chief, was Plaintiff's first-line supervisor; James Treat, Assistant Division Chief, was her second-line supervisor; and Ruth Ann Killion, Division Chief, was her third-line supervisor.

Huang's only assignment was to evaluate the United States Postal Service's Delivery Sequence File ("DSF") for the Geography Division of the Census Bureau, with respect to its accuracy and usability. To complete the project successfully, by February 3, 2005, Huang needed to produce a study plan outlining the research she would perform, and by September 30, 2005, needed to produce a report documenting the research she would conduct.

### B. Chronology of Plaintiff's Allegations of Protected Activity

In January 2005, Nancy Johnson, a female GS-13 Statistician who reported to Colosi, complained that Colosi was behaving inappropriately toward women in the office. As a result of Johnson's complaint, the Agency conducted a formal investigation. Robert Creecy was the investigator tasked with conducting the investigation. During the investigation, the six employees Colosi directly supervised, including Huang, were interviewed.

On or about February 15, 2005, Treat took over as Huang's first line supervisor until she was terminated from the Census Bureau. Colosi continued to review and provide feedback on

Huang's work product, but did not meet with Huang or any other staff. Although Treat took over for Colosi on February 15, he did not immediately meet with Colosi's staff to monitor their projects. (Doc. No. 49, Ex. 15 at 1-2). He took the remaining two weeks of February 2005 to integrate the meetings he was now responsible for with Colosi's staff into his calendar, which already included meetings and responsibilities for his job as Division Chief. *Id.* Beginning on March 1, 2005, Treat met with Colosi's staff at regular weekly intervals. He did not meet with Huang individually until March 7, which was for the purpose of bringing Treat up to speed on Huang's project. Thereafter, they met regularly concerning the project, sometimes as often as once per week.

On or about March 9, 2005, Creecy interviewed Huang. On the same day, she met with Treat. During her meeting with Treat, she informed him of her opinion of Colosi: that of the four types of managers she described, he was the worst, with weak technical ability and a difficult personality. (Doc. No. 49, Ex. 5 at 16-17; Ex. 15 ¶ 7). Huang additionally stated that Colosi has no respect when speaking with staff; that he interrupts; that she does not like his tone; that he is inconsistent with directions; that he is unprofessional; and that he is condescending. (Doc. No. 52, Ex. 2 at 4). She stated that others on staff are bothered as well. *Id.* Later that day, Creecy emailed Treat saying that he understood that Treat had met with Huang that morning, and he asked for any notes from that meeting. (Doc. No. 52, Ex. 7). Treat responded that his notes were handwritten and that he would send them. *Id.*

The Agency reprimanded Colosi for inappropriate behavior in the workplace on May 24, 2005, determining that he trivialized the work of his female staff and was overly critical of them.

3

However, the Agency did not conclude that he had engaged in sexual harassment or discrimination.

### C. Plaintiff's Job Performance

Defendant has alleged that Huang was given a set of deadlines in October 2004 for her project and was behind as early as November 2004. (Doc. No. 49, Ex. 1, Tab 9 at 163). In early November 2004, Colosi was not satisfied with Huang's progress and informed Killion that Huang was having performance-related problems, including trouble meeting deadlines and following supervisory direction. (*Id*., Tab 11 at 176). In late November 2004, Colosi met with Huang to discuss the status of her DSF project and address his concerns that she: was not performing acceptably; required more guidance than a typical GS-13 employee; and needed to complete tasks in a timely manner. (*Id*., Tab 9 at 163; Ex. 8 at 58-59, 103-104). In January and early February 2005, Colosi requested that Huang produce a definition for one of the two parts of her evaluation, and when she failed to do so, he did it himself. (Doc. No. 49, Ex. 1, Tab 9 at 164).

As detailed above, Treat took over supervision of Colosi's staff on February 15, 2005. On March 9 and 10, 2005, Treat asked Huang to provide a copy of her study plan with Colosi's edits and the new draft, then did side-by-side comparisons and demanded that Huang incorporate all the edits that she was provided with. Throughout the spring, Treat continued to express dissatisfaction with Huang's technical performance and response to directions. On March 23 or 24, 2005, Treat conducted a progress review with Huang and noted that she had failed to incorporate Colosi's comments into her most recent draft of her study plan; that she was not

adequately merging the analysis files; and that her participation in project status meetings was inadequate.

According to Defendant, Huang repeatedly failed to incorporate her supervisor's edits into her work. Huang submitted a Draft Study Plan on January 23, 2005 that was edited by Colosi and returned. (Doc. No. 49, Ex. 9). Plaintiff submitted the next draft on February 25, 2005. (Doc. No. 49, Ex. 10). When Colosi reviewed this document, he noticed that many of his edits had not been made and highlighted the previously-ignored revisions for Plaintiff's reference. (Doc. No. 49, Ex. 12). Colosi made additional edits and informed Plaintiff that she should contact him if she had questions. When Treat, as acting supervisor, passed on the draft, he included a memorandum reminding Huang of their midterm review meeting and a discussion they had about Huang not incorporating edits. Huang submitted a third draft on April 9, 2005, and Treat's review noted, "[s]ome of my comments Bob already provided and you did not incorporate." (Doc. No. 49, Ex. 14 at 24). Huang has testified that she chose to ignore some revisions because she had not yet begun the final draft and her focus was on major research issues. (Doc. No. 49, Ex. 8 at 95-97).

Throughout his time supervising Plaintiff, Treat expressed concern to his supervisor, Killion, that Huang was continuing to have significant difficulty meeting deadlines, working independently, following supervisory guidance, and advancing her project. (Doc. No. 49, Ex. 1, Tab 11 at 176-77). He shared these issues with Plaintiff at her midterm review, and he also expressed concern that the ultimate project deadline would be missed. Treat instructed Huang to create an updated schedule for the project that would lead to on-time completion. (Doc. No. 49, Ex. 1, Tab 10 at 170). When she produced the updated schedule, he found it was lacking the

5

appropriate list of activities and the necessary relationships among them to complete the project on time. *Id*. Huang also did not run an analysis requested by Treat and Colosi, stating that she did not believe it was necessary. *Id.*

Furthermore, Treat avers that he had concerns about Plaintiff's technical ability. He provided Huang with a methodology for analyzing changes in the DSF status, called the "waffling" analysis. *Id*. at 170-171. He then provided Huang with instruction on recoding the information and asked her to run the analysis several different ways and present the analysis that best fits the situation. *Id*. Huang was unable to produce all of the requested analyses and could not interpret the analysis that she was able to run. *Id*. She also had difficulty designing analysis tables that appropriately presented the results. *Id*. Although she had been working on the analysis of the DSF evaluation for several months, in her supervisor's opinion, she did not have a clear understanding of the data and the direction the analysis should take to answer the research questions. *Id*. All of this led Treat to the conclusion that Huang was not performing at the GS-13 level. *Id*. at 171.

In March 2005, Treat met with personnel from human resources to discuss Huang's termination. On July 15, 2005, Killion, the Reviewing Official, rated Huang "unsatisfactory" in three of seven "Critical Elements" of her performance: (1) Evaluation Planning and Project Management, (2) Data Analysis, and (3) Research and Development. Huang refused to sign this evaluation, as she felt it was inconsistent with the reality of her work. Treat recommended that Huang be terminated, and Killion did not object after reviewing the situation. In a letter dated July 19, 2005, the Agency informed Huang that her employment would be terminated on July 22, 2005, because she failed to effectively complete evaluation, planning and management of her

project and failed to demonstrate an ability to analyze data or perform research.  Huang resigned

on July 21, 2005 to avoid being terminated.

Huang believes that none of these criticisms are true.  She contends that on April 6,

2005, Colosi acknowledged that her project was satisfactory, stating:

> Mary told me that she gave you my comments on the DSF Study Plan.  Overall the plan is in OK
> shape.  My comments sometimes go onto the back of a few of the pages.  If you have any
> questions about my comments, feel free to Sametime me and we can discuss them that way.  I
> don't want the plan to go to GEO until I have another look at it.

(Doc. No. 52, Ex. 17 at 2).

Huang responded to Colosi one week later with another draft, stating, "I did incorporate

most of your comments into this version, and for the few ones I did not incorporate, I would like

to explain to you why I did not later." *Id*. at 3.  Huang further explains that Treat yelled at her

whenever she "didn't get [analyses] done immediately," even though he did not yell at other

people for that.  (Doc. No. 52, Ex. 24 at 2).  Huang believes that criticism from Treat was

sparked by the statements she had made against Colosi during the investigation against him.

(Doc. No. 52, Ex. 1 at 7).

Huang also points out, drawing the Court's attention to Treat's deposition, that two

individuals representing the client—David Galdi, Assistant Division Chief, and Bob Lamachia,

Division Chief of the Geography Division—were satisfied with her work.  (Doc. No. 52, Ex. 3 at

4-5).

**D.  Procedural History of Plaintiff's Complaint**

On July 18, 2005, Huang contacted the Equal Employment Opportunity Office

("EEOO"), and on September 12, 2005, she filed a claim with the EEOO alleging retaliation and

discrimination based on gender and national origin.  The EEOO investigated the case and issued

a Report.  Additionally, around January 7, 2008, Huang filed a complaint alleging reprisal for

whistle-blowing with the Office of Special Counsel ("OSC") pursuant to 5 U.S.C. § 2302(b)(8),

which the OSC declined to pursue on March 28, 2008.  On January 28, 2008, the EEOO issued a

final decision pursuant to 29 C.F.R. § 1614.110(b), concluding that Huang failed to prove that

the Department of Commerce had discriminated or retaliated against her.  Huang then appealed

the decision to the Equal Employment Opportunity Commission's Office of Federal Operations

("OFO"), which found that Huang failed to show that the Agency discriminated against her.  On

August 1, 2008, the OFO denied Huang's request to reconsider her appeal.

On October 30, 2008, Huang brought the instant Complaint in this Court against the

Secretary of the Department of Commerce alleging employment discrimination on the basis of

national origin and sex (Counts 1 & 2) and retaliation (Count 3).  She seeks declaratory and

injunctive relief, including reinstatement to the position she previously held, back pay, and

compensation for her lost benefits.  On March 30, 2009, Defendant moved for summary

judgment.  On January 6, 2010, this Court granted summary judgment on the national origin and

sex discrimination claims and denied summary judgment on the retaliation claim.  Discovery is

complete, and the Defendant has moved for summary judgment on the remaining retaliation

claim.  (Doc. No. 49).

## II.    STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable

8

inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).

## III.    ANALYSIS

Retaliation under Title VII is subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), in the absence of direct evidence of retaliation.  *See Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 298 (4th Cir. 2004). Under this framework, the plaintiff must first establish a *prima facie* case of retaliation. The defendant must then provide a legitimate and non-retaliatory reason for the adverse employment actions. If the defendant can do so, then the plaintiff must establish by a preponderance of the evidence that the legitimate motive is not the real one, but rather a pretext for retaliation.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.

"To establish a prima facie case of retaliation, an employee must show (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that a causal connection exists between the protected activity and the adverse employment action."  *Hill*, 354 F.3d at 298.

Defendant argues that Plaintiff cannot make out a *prima facie* case. Defendant further

contends that even if Plaintiff can establish a *prima facie* case, the adverse actions taken against

the Plaintiff were motivated by the legitimate, non-retaliatory reason of Plaintiff's poor work

performance, and that Plaintiff cannot prove that this asserted motive is a mere pretext for

retaliation. The Court will address each of these arguments in turn.

**A. *Prima Facie* Case**

The Defendant argues that Plaintiff cannot make out a *prima facie* case for one of two

reasons: (1) Plaintiff did not engage in a protected activity; or alternatively, (2) if Plaintiff did

engage in a protected activity, Plaintiff cannot establish a causal link between the protected

activity and her termination.

Defendant's first argument is that Plaintiff's claim of retaliation has been clarified

through her deposition to be based upon a conversation with Treat, in which she made no

allegations of discrimination. Defendant argues that because Plaintiff did not allege

discrimination in that conversation, it is not protected activity, and therefore any retaliation based

on that episode would not violate Title VII. *See Prince-Garrison v. Maryland Dept. Of Health

and Mental Hygiene*, No. 08-1090, 317 F. App'x 351, 354 (4th Cir. Mar. 13, 2009) ("Protected

activity within the meaning of Title VII includes opposing discriminatory practices or

participating in any manner in a Title VII investigation, proceeding, or hearing.").

This argument is unpersuasive for two reasons. First, Plaintiff contends in the Complaint

and in the instant Motion that her claim is based on participation in the EEO investigation. Even

if she emphasized other theories in her deposition, the Court must still decide whether Plaintiff

has a triable claim based on the theories presented in her Complaint, and in each theory she

provides in opposition to summary judgment. Second, even if the Court were to take the meeting with Treat as the sole basis for Plaintiff's claim, Plaintiff claims that she told Treat that her complaints were on behalf of the women on staff. (Doc. No. 52, Ex. 1 at 6). Therefore, her conversation with Treat may be construed as protesting discriminatory behavior toward women, and thus as protected activity.

Defendant's second argument is that even if participation in the EEO investigation is the protected activity, there is no causal link between protected activity and retaliation because Treat was unaware of the protected activity. However, Plaintiff presents facts that place Treat's awareness in serious dispute. Treat was contacted by Creecy, the person investigating the harassment allegations against Colosi, who specifically stated, "[w]hen I spoke to [Huang] she mentioned that she had talked to you the same morning. Do you have the notes from that meeting you can send me? For completeness, I would like to add them to my investigation." (Doc. No. 52, Ex. 7). Treat responded to this inquiry and provided the notes. *Id.* Moreover, Colosi, whether specifically aware or not of Plaintiff's participation, attributed allegations in Creecy's investigation to Plaintiff. (Doc. No. 52, Ex. 5 at 5). Therefore, Treat and Colosi, both of whom were involved in the decision to terminate Plaintiff, were arguably aware of Plaintiff's participation in the EEO investigation.

As this Court explained in its prior opinion, the temporal proximity between Plaintiff's protected activity and the adverse employment action creates an inference of causation for purposes of the *prima facie* case. (Doc. No. 32, at 21). Plaintiff claims that a pattern of antagonism ensued after her engagement in the protected activity, and that the Agency terminated her just four months after her reporting. Treat held only one meeting with Huang

11

from February 14, 2005, to March 9, 2005, and he never told her that he had problems with the

progress of her study plan during this period. After her reporting, however, he met with her

almost weekly and criticized her work leading to her termination. (Doc. No. 49, Ex. 15 ¶ 5; Doc.

No. 52 at 8). Therefore the Court finds that Plaintiff has sufficiently made out a *prima facie* case

of retaliation.

**B. Employer's Proffered Reasons for the Adverse Employment Action**

Next, Defendant argues that Huang's unacceptable performance constitutes a legitimate,

non-retaliatory reason for her termination of employment. The Defendant has cited to numerous

examples, detailed in the statement of facts, from continual refusal to include edits from

Plaintiff's supervisors, to an inability to meet deadlines, to a lack of response to a requested task

which resulted in the supervisor completing the task. Plaintiff does not dispute that Defendant

has met its burden of production on this point.

**C. Burden of Demonstrating Pretext**

Finally, Plaintiff must show by a preponderance of the evidence that the reasons

proffered by Defendant for her termination are pretextual. Plaintiff cannot meet this burden.

The central facts Plaintiff relies on are: (1) the temporal proximity between her protected activity

and harsh supervision by Treat, and (2) purported approval of her project by the client and

Colosi. The Court will address each argument in turn.

In the Court's previous Memorandum Opinion denying Defendant's pre-discovery

motion for summary judgment on the retaliation count, the Court emphasized the temporal

proximity between Plaintiff's protected activity and Treat's harsh behavior toward her. *See* Doc.

No. 32 at 22-23. However, discovery has clarified the facts relating to Treat's supervision of

Plaintiff, and Defendant can now account for the temporal proximity between protected activity and adverse action. Treat took over as Plaintiff's supervisor roughly three weeks before the Plaintiff's protected interview with Creecy. *See* Doc. No. 49, Ex. 1, Tab 43. At that point, Treat was performing the work of two positions and did not meet with the Plaintiff (or other members of Colosi's staff) individually until days before she participated in the EEO investigation. (Doc. No. 49, Ex. 15 ¶¶ 3-6). The goal of that meeting was to get Treat up-to-speed on Plaintiff's project so that he could properly supervise her. *Id*. at ¶ 6. He only had the opportunity to review her work in a meaningful way after that meeting, and therefore after her protected activity. *Id*. Thus, any change in the level of criticism directed at Plaintiff by Treat around the time of Plaintiff's protected activity could just as easily be attributed to Treat's new-found familiarity (and dissatisfaction) with her work rather than to the protected activity.

Plaintiff also argues that the client approved her work and that Colosi indicated that he was satisfied with her draft. However, this Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination," *DeJarnette v. Corning Inc.,* 133 F.3d 293, 298-99 (4th Cir. 1998) (quotations and citations omitted), and the Court declines Plaintiff's invitation to substitute its own job-performance judgments for those of Plaintiff's supervisors. In any event, Colosi's comment is far from being a ringing endorsement of Plaintiff or her work: he merely states that her draft is "okay" and that he does not want it to be sent to the client until after he reviews it again. (Doc. No. 52, Ex. 17). Furthermore, it is Huang's immediate employer's performance criteria, not those of the client, that ultimately matter. The client's apparent satisfaction does not contradict any of the problems Treat and Colosi encountered regarding editorial supervision,

13

problems meeting deadlines, and other internal criticisms.  Thus, Plaintiff has not raised

sufficient facts to show that Defendant's proffered motive is a pretext for retaliation, and

Defendant is entitled to summary judgment on the remaining retaliation claim.


**IV.    CONCLUSION**

For the foregoing reasons, the Court will GRANT Defendant's Motion for Summary

Judgment.  (Doc. No. 49).  A separate Order will follow.


   December 20, 2010   

       Date                                                  /s/_____

Alexander Williams, Jr.
United States District Judge